IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JANNIE LIGONS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. CIV-16-184-HE |
| | ) | |
| CITY OF OKLAHOMA CITY, | ) | |
| a municipal corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MOTION TO ALTER OR AMEND JUDGMENT IN FAVOR OF DEFENDANT BRIAN BENNETT

**RIGGS, ABNEY, NEAL, TURPEN,
  ORBISON & LEWIS, P.C.**

s/Damario Solomon-Simmons
Damario Solomon-Simmons, OBA # 20340
Kymberli J. M. Heckenkemper, OBA # 33524
502 West 6th Street
Tulsa, Oklahoma 74119
(918) 587-3161—Office
(918) 587-9708—Fax
dsimmons@riggsabney.com
kheckenkemper@riggsabney.com

**-and-**

Melvin C. Hall, OBA # 3728
528 NW 12th Street
Oklahoma City, OK 73103
(405) 843-9909—Office
(405) 842-2913—Fax
mhall@riggsabney.com

**PARKS & CRUMP, LLC**

Benjamin L. Crump
FL Bar No. 72583
122 South Calhoun Street
Tallahassee, Florida 32301
bcrump@parkscrump.com

***Attorneys for Plaintiffs Ligons,
Hill, Johnson, Morris & Lyles***

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ii

LIST OF EXHIBITS ..................................................................................................... iii

ARGUMENT & AUTHORITIES.....................................................................................2

I.     STANDARD FOR MOTIONS TO ALTER OR AMEND A JUDGMENT......................2

II.    PLAINTIFFS' § 1983 CLAIM FOR FAILURE TO SUPERVISE .....................................3

    A.    Newly Discovered Evidence of Bennett's Supervisory Responsibility over Holtzclaw with Respect to the Campbell Incident..........................................................................4

    B.    Newly Discovered Evidence of the Causal Link Between Bennett's Failure to Investigate and Document the Campbell Incident and Violations of These Plaintiffs' Rights6

III.   INVASION OF THE JURY'S PROVINCE ......................................................................14

CONCLUSION ..............................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................4

**STATUTES**

42 U.S.C. § 1983 ...........................................................................................................*passim*

**RULES**

Fed. R. Civ. P. 59(e) ........................................................................................................2

## <u>LIST OF EXHIBITS</u>

Exhibit 1     Excerpts from Transcript of Deposition of Lieutenant Brian Bennett (Sept. 19, 2018)

Exhibit 2     Excerpts from Transcript of Deposition of Captain Arthur Gregory (Feb. 21, 2019)

Exhibit 3     Annual EIP Notification 2013 (Mar. 11, 2014)

Exhibit 4     Email from Captain Arthur Gregory to Lieutenant Brian Bennett et al. (Mar. 27, 2014)

Exhibit 5     Email & Attachments from Lieutenant Brian Bennett to Captain Arthur Gregory (Mar. 28, 2014)

Exhibit 6     EIP Supervisor's Responsibilities (In-Service Training Slide)

Exhibit 7     Third Amended Criminal Information, *State v. Holtzclaw*, CF-2014-005869, Oklahoma County District Court (filed Aug. 29, 2014).

Exhibit 8     Excerpts from Transcript of Deposition of Detective Rocky Gregory (Jan. 17, 2019)

Exhibit 9     Judgment & Sentence

Exhibit 10    OCPD Operations Manual Procedure 401.0

Exhibit 11    Excerpts from Transcript of Deposition of Demetria Campbell (Feb. 15, 2018)

Exhibit 12    Holtzclaw Termination Letter

Exhibit 13    Email from Chief William Citty to Deputy Chief Tom Jester (Aug. 26, 2014) (not waiting for criminal adjudication)

Exhibit 14    *KOCO Chronicle Part 4: Were There Red Flags in Daniel Holtzclaw's Past?*, KOCO.COM (Apr. 5, 2016, 7:31 P.M.) (video)

Exhibit 15    Officer Jonathan Thomas Standard Supplement Report (May 24, 2014).

Exhibit 16    Det. Gregory Standard Supplement Report (Jun. 17, 2014) (Interview with Officer Thomas)

Exhibit 17              Morris Investigation Emails (May 27, 2014 – Jun. 2, 2014)

Exhibit 18              Excerpts from Transcript of Deposition of Lieutenant Timothy Muzny
                        (Mar. 26, 2019)

Exhibit 19              Excerpts from Transcript of Deposition of Captain Ron Bacy (Mar. 27,
                        2019)

Exhibit 20              Excerpts from Transcript of Deposition of Deputy Chief Brian Jennings
                        (Apr. 23, 2019)

Exhibit 21              Det. Rocky Gregory Standard Supplement Report (Jun. 17, 2014)
                        (Officer Contacts with Morris)

Exhibit 22              Photo Lineup Admonition Form

Exhibit 23              Excerpts from Transcript of Deposition of Major Denise Wenzel (Apr. 29,
                        2019)

Exhibit 24              Refusal to Prosecute Form

Exhibit 25              Det. Gregory Standard Supplemental Report (Jun. 18, 2014) (First
                        Detective Contact with Terri Lynn Morris – Victim)

Exhibit 26              OCPD Operations Manual, Policy 285.0 *et seq.*

Exhibit 27              Emails between Deputy Chief Johnny Kuhlman, Major Denise Wenzel &
                        Captain Ron Bacy (Aug. 26, 2014) (Re: Initiating Holtzclaw Internal
                        Affairs Investigation)

Exhibit 28              Email from Captain Ron Bacy to Lieutenant Timothy Muzny (Jun. 10,
                        2014) (Re: Officer-Involved Case)

Exhibit 29              Det. Gregory Standard Supplement Report (Jul. 24, 2014) (Interview
                        with Daniel Holtzclaw)

Exhibit 30              Petition, *Demetria Campbell v. City of Oklahoma City et al.*, Oklahoma
                        County District Court, Case No. CJ 2015-4217 (Judgment Entered Apr.
                        22, 2019)

## PLAINTIFFS' MOTION TO ALTER OR AMEND JUDGMENT
## IN FAVOR OF DEFENDANT BRIAN BENNETT

COME NOW, Plaintiffs Jannie Ligons, Terri Morris, Carla Johnson, Kala Lyles & Shardayreon Hill, and bring this Motion to Alter or Amend Judgment in Favor of Defendant Brian Bennett ("Bennett"). [Dkt. 190]. In support of their Motion, Plaintiffs respectfully present as follows:

1.     On October 12, 2018, Plaintiffs served on the City of Oklahoma City ("the City") certain discovery requests, which sought, *inter alia*, documents relating to Holtzclaw's prior uses of force and complaints, and emails related to Holtzclaw that were sent or received by certain OCPD officers (including Bennett). The City agreed to produce some of the documents sought, but would not advise Plaintiffs of a timetable for production.

2.     Bennett moved for summary judgment [Dkt. 152] on November 20, 2018. Plaintiffs responded [Dkt. 159] December 14, 2018, and briefing concluded on January 4, 2019.

3.     From January 8, 2019 to March 27, 2019, Plaintiffs received a slow drip of information from the City. On January 8, the City produced 27,728 pages of documents, including training materials for recruits and supervisors on uses of force and investigations thereof, documentation of Holtzclaw's participation in the OCPD Early Intervention Program ("EIP"), and 8,851 pages of emails. On January 18, the City furnished approximately 668 pages of police reports Plaintiffs requested in 2016. On January 29, Plaintiffs received 1,583 pages of documents, including Holtzclaw's other use of force investigations and standard operating procedures for Internal Affairs, the Sex Crimes Unit ("Sex Crimes"), and the Springlake

Division ("Springlake") (where Bennett and Holtzclaw worked). Finally, on March 27, the City produced 6,905 more pages of emails in response to Plaintiffs' October 2018 requests.

4.      Additionally, over the past five months, Plaintiffs deposed (1) Det. Rocky Gregory ("Det. Gregory"), who co-led the Holtzclaw investigation (Jan. 17, 2019) with (2) Det. Kim Davis (Jan. 29, 2019); (3) Lt. Timothy Muzny, who supervised Sex Crimes (Mar. 26, 2019); (4) Capt. Ron Bacy, who served as captain in the OCPD Investigations Bureau ("Investigations") (Mar. 27, 2019); (5) Maj. Denise Wenzel, who was major over Investigations at the time of the Holtzclaw investigation (Apr. 29, 2019); (6) Capt. Arthur Gregory ("Capt. Gregory"), who was Holtzclaw's first-line supervisor at the time of the Campbell Incident and until Holtzclaw was terminated (Feb. 21, 2019); and (7) Deputy Chief ("D.C.") and Brian Jennings, who, at the time of the Campbell Incident, was Springlake Division Commander (Apr. 23, 2019). The documents produced by the City between January 8, 2019 and March 27, 2019 formed the basis for a large portion of the questions Plaintiffs' counsel asked in several of these depositions.

## **ARGUMENT & AUTHORITIES**

### I.      **STANDARD FOR MOTIONS TO ALTER OR AMEND A JUDGMENT**

Federal Rule of Civil Procedure 59(e) allows a party to move to alter or amend a judgment based upon "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice," *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000), and "is appropriate where the court has misapprehended the facts, a party's position, or the controlling law," *id.*

Plaintiffs respectfully move the Court to alter or amend the judgment entered in favor of Bennett on Plaintiffs' § 1983 claim on multiple grounds. First, evidence uncovered in the months since the parties completed briefing the issues raised in Bennett's Motion for Summary Judgment [Dkt. 152] adds support to Plaintiffs' claim against Bennett under 42 U.S.C. § 1983. In particular, new evidence demonstrating the level of responsibility Bennett had for Holtzclaw in connection with the Campbell Incident adds further support to the failure-to-supervise claim. Such evidence comes in the form of testimony from Holtzclaw's first-line supervisor, Capt. Gregory, which demonstrates that he had no responsibility for Holtzclaw with respect to the Campbell Incident and in fact had no knowledge of it, and that Bennett *volunteered* to respond to that call, indicating he willingly assumed what otherwise would have been Capt. Gregory's supervisory responsibility. Moreover, reports and testimony from OCPD officers who were involved in the investigation into Holtzclaw's assault against Plaintiff Morris ("Ms. Morris") strengthens Plaintiffs' proof of the causation element. Finally, in deciding Bennett's Motion, the Court appeared to consider Campbell's credibility. Such a consideration was improper as a matter of law under the summary judgment standard. Accordingly, Plaintiffs ask the Court to reconsider its Order granting Bennett's Motion.

## II.     PLAINTIFFS' § 1983 CLAIM FOR FAILURE TO SUPERVISE[1]

In granting summary judgment for Bennett on Plaintiffs' failure-to-supervise claim, the Court emphasized three findings: (1) that Bennett was not Holtzclaw's "regular or first line supervisor," (2) that the causation element is not met because Plaintiffs were sexually assaulted

---

[1] Plaintiffs incorporate by reference the discussion of the applicable law in their response brief. [*See* Dkt. 159, pp. 16-18].

"months later," and because Bennett had nothing to do with those investigations, and finally (3) that "it is less than obvious that different training or supervision would have made any difference." Plaintiffs address each of these findings in turn. First, they offer new evidence of Bennett's supervisory responsibility over Holtzclaw. Second, they demonstrate the causal link by presenting new evidence of how Bennett's actions hindered the apprehension of Holtzclaw.

A.    Newly Discovered Evidence of Bennett's Supervisory Responsibility over Holtzclaw with Respect to the Campbell Incident

Though not Holtzclaw's "regular or first-line supervisor," Bennett *was* his supervisor with respect to the Campbell Incident. New evidence proves Bennett was exclusively responsible for investigating that incident and reporting all the facts up his chain of command. To reiterate, OCPD Procedures place *all* responsibility for investigating a use of force—which is how Bennett characterized Campbell's complaint—on the *investigating* supervisor. [Dkt. 159-6 (§ 150.12)]. The same is true as to the responsibility to complete the investigation report and send it up the chain of command. [*Id.*]. It is undisputed that Bennett was the investigating supervisor responsible for investigating and documenting the Campbell Incident. [Dkt. 152, pp. 2-3; Ex. 1, 63:1-6]. And, contrary to Bennett's testimony that Holtzclaw's supervisor was not at work on the night of that incident and that he happened to be the "lucky" supervisor to be assigned to the call [Dkt. 152-4, 100:15-20], new evidence indicates he *voluntarily* assumed responsibility over that investigation. Capt. Gregory testified that he *was* on duty the night of the incident, and that Bennett *volunteered* to take the call. [Ex. 2, 95:1-20, 96:18-20]. He testified that even after he told Bennett he could respond as soon as he finished up another incident, Bennett said he would "take care of it." [*Id.*].

4

By contrast, Holtzclaw's first-line supervisor, Capt. Gregory, bore *no* responsibility for the Campbell Incident or the investigation thereof, and in fact, he knew nothing about the circumstances of the incident until long after Holtzclaw had been terminated. Capt. Gregory testified that he only talked to Holtzclaw about the uses of force *he* investigated, [*Id.*, 151:11-24], and that he only became aware of incidents other supervisors investigated when he prepared Holtzclaw's EIP reports. [*Id.*, 151:11-152:9]. Beyond that, Capt. Gregory was oblivious, as he did not have access to reports on uses of force investigated by other supervisors. [*Id.*, 197:7-16].

Importantly, EIP notifications are not sent frequently (quarterly and annually—if an officer is eligible) [Dkt. 159-10 (§ 148.20)], and they contain only basic information about use-of-force incidents. [*See* Ex. 3, pp. 3-4]. Further, newly discovered emails between Capt. Gregory and other investigating supervisors, including Bennett, indicate that when Capt. Gregory sought additional information about Holtzclaw's uses of force in preparing the EIP report, he asked each investigating supervisor for their *supervisor narrative*, rather than the entire packet. [Ex. 4]. Thus, when Capt. Gregory finally did learn of the Campbell Incident (nearly five months later), he only learned what Bennett included in his supervisor narrative. [*See* Ex. 5]. As the evidence shows, the supervisor narrative made no reference to perversion or racial prejudice [Dkt. 152-3, pp. 6-19, 132:14-135:2]. And the supervisor narrative omitted facts which, by Bennett's admission, Campbell conveyed to him, but which appeared only in his Subject Interview summary. [*Compare* Dkt. 153-1, pp. 2-4 *with* Dkt. 153-1, pp. 5-7]. These omitted facts contradicted Holtzclaw's account [*see* Dkt. 159-4]). Capt. Gregory only became aware of those facts *this year*. [Ex. 2, 100:3-101:14].

Even if Capt. Gregory *had been* apprised of *all* the facts and allegations Campbell conveyed to Bennett through the EIP process in March 2014, he would not have been authorized to do anything about it. At that point, Bennett's investigation was already adjudicated, and supervisors are affirmatively trained not to use the EIP program as a disciplinary procedure or to change the disposition of prior investigations. [*Id.*, 148:5-19; Ex. 6, pp. 3, 4].

In sum, it was not Capt. Gregory's responsibility to investigate, much less document, the Campbell Incident; it was Bennett's. And, even after Bennett investigated, neither Capt. Gregory nor anyone further up the chain of command could have taken any action to alleviate the risk Holtzclaw posed to Black women he encountered, because Bennett's actions ensured that Capt. Gregory and those further up the chain of command were left unaware of the details of the Campbell Incident. By the time Capt. Gregory became aware of the facts in Bennett's supervisor narrative, Holtzclaw had already turned into a serial sex offender who targeted Black women— women like Campbell. By the end of February of 2014, had already violated Plaintiffs Hill and Barnes and one other victim [Ex. 7, pp. 1, 5-6 (Counts 1-2, 21-26)].

B.    Newly Discovered Evidence of the Causal Link Between Bennett's Failure to Investigate and Document the Campbell Incident and Violations of These Plaintiffs' Rights

Bennett's sham investigation of the Campbell Incident, his failure to treat Campbell's allegations as a citizen complaint, and his omission of her allegations of perversion and prejudice from his follow-up investigation report immunized Holtzclaw from facing any scrutiny or consequences for his perverted, racist acts, resulting in these Plaintiffs' assaults.

When Bennett's failure to properly investigate and report Holtzclaw's actions against Campbell permitted Holtzclaw to escape responsibility for these actions, Holtzclaw became

emboldened and escalated his criminal acts against Black women. Based on testimony of Det. Gregory, the six-year veteran of Sex Crimes [*see* Ex. 8, 9:18-10:2] who led the Holtzclaw criminal investigation, Holtzclaw escalated to assaulting Plaintiffs as a direct result of his getting away with the Campbell Incident. Det. Gregory testified that in his experience, rapists generally do not start with rape, but with less serious offenses, like "grabbing [] buttocks," "peeping tom," or even "pressing their penis against [a victim's] backside." [*Id.*, 290:19-291:13; *see also* Ex. 11,51:8-52:24]. He said that when they "[get] by with" one thing, they "feel more boldened [sic]," so they "escalate"—they think they can "push the issue" and "get a bigger high" with the next victim. [Ex. 8, 290:1-291:22]. Holtzclaw was no exception. Det. Gregory testified that in the period during which Holtzclaw was assaulting Plaintiffs, he "really ramped it up." [*Id.*, 290:7-12, 291:6-9].

Newly discovered evidence also suggests that had Bennett properly treated Campbell's allegations as an actual citizen complaint, rather than a use of force, the crimes committed against these Plaintiffs would have been prevented. To put the new evidence in context, it is important to note that when a citizen makes a complaint against an officer, the receiving officer must refer the complaint to the officer's supervisor, who must ensure that it is "fully investigated" and notify the Office of Professional Standards ("OPS")[2] of the pending investigation. [Dkt. 159-7 (§ 143.0)]. Once the supervisor completes the investigation, the findings are submitted to the Chief of Police. [*Id.*]. Thus, had Bennett treated Campbell's allegations, particularly those

---

[2] The OPS is commanded by a Captain who is organizationally assigned to the Office of the Chief of Police. [Ex. 10 (§ 401.0)].

claiming Holtzclaw was prejudiced and perverted,[3] as a complaint, it would have been referred to Capt. Gregory and reviewed by Defendant Bill Citty ("Chief Citty"), who unquestionably had the authority to discipline and even terminate Holtzclaw. [*See* Dkt. 159-7 (§ 143.0)]. Had that been the case, Chief Citty would have learned of Campbell's allegations that Holtzclaw was prejudiced, aggressive, hateful, and perverted toward her as a Black woman. Notably, after Holtzclaw had been charged for his crimes against Plaintiffs, but before he was convicted [Ex. 9], Chief Citty terminated him, calling his actions "the greatest abuse of police authority [he had] witnessed in [his] 37 years . . . ." [Ex. 12; *see also* Ex. 13]. In an interview, he noted that Holtzclaw had "no red flags" [Ex. 14, 00:53-01:40]:

| | |
|---|---|
| **Reporter:** | You're the police chief. You're going through this young man's files. You don't have any red flags, but yet he's facing such, such serious allegations. What are you thinking at that point? |
| **Chief Citty:** | If you would've told me that we had a serial rapist, an officer that was a serial rapist before this event, then I would have told you that wouldn't have happened. That wouldn't happen. |
| | [ . . . ] |
| **Reporter:** | Was there anything that you feel like you or the department could have done? |
| **Chief Citty:** | To predict what an officer is going to be ethically and personally is what they've been in the past. |

[*Id.*]. If Chief Citty had known Holtzclaw had been prejudiced and perverted toward a Black woman before, he would have predicted that Holtzclaw would have acted similarly in the future and stripped of him of his badge long before he had a chance to harm *any* of these Plaintiffs.[4]

---

[3] Bennett testified that if Campbell had told him what she testified she told him, he would have had to take those allegations up his chain of command. [*See* Ex. 1, 78:11-12, 79:19-81:16].

[4] The fact that Chief Citty did not have notice (saw no red flags) of the particular problem regarding Holtzclaw does not relieve the City of its obligation or liability.  Chief Citty did not

Further, new evidence demonstrates that even if Holtzclaw had not been terminated as a result of an administrative investigation into Campbell's allegations of prejudice and perversion, at least those assaults which he committed in his final days as an OCPD officer could have been prevented. If Chief Citty had known of a prior complaint against Holtzclaw for perverted and prejudiced conduct when the first victim whom Holtzclaw was criminally charged with assaulting made her report to OCPD, Holtzclaw would have been confirmed as a suspect, and taken off the streets, more quickly.

To illustrate, it is necessary to first discuss the timeline of OCPD's investigation into Plaintiff Terri Morris' assault. Ms. Morris, the first of Holtzclaw's victims to report her assault, told officers on May 24, 2014 that she had been sexually assaulted by an OCPD officer. She provided a physical description of the offending officer and reported that he had run a check for warrants on her. [Ex. 15]. By May 29, 2017, Holtzclaw was identified as the only OCPD officer who ran Ms. Morris's name through OCPD's CIU system in the month in which she stated her assault occurred, and who substantially fit the description of her assailant[5] she provided [Ex. 17 (particularly p. 5); Ex. 18, 127:3-129:21; Ex. 8, 197:2-198:7, 236:24-237:7, 53:24-54:5; Ex. 19,

---

have notice of the Holtzclaw problem because the manner in which the City regularly "investigated" citizen complaints created the perfect opportunity for Bennett to fail in his duties without consequence. The City's history of failing to hold officers accountable for misconduct constituted a policy, practice, or custom. Therefore, the City had a custom, policy, or practice which not only permitted, but encouraged, insufficient investigations and disregard of citizen complaints. Thus, the Plaintiffs in this action have been harmed both by Bennett's failure to investigate and supervise Holtzclaw and by the City's custom, policy, or practice which permitted and encouraged Bennett's actions and the similar actions of others in his position to disregard citizen complaints and to fail to take actions to protect the public from officer misconduct.

[5] "[D]ark skinned white male with black hair . . . appeared to be about 40 years old. . . . [M]uscular build and [] clean shaven." [Ex. 15]. "40's in age . . . Around 6'00" . . . ." [Ex. 16].

41:14-42:19; Ex. 2, 157:1-158:9; Ex. 20, 32:1-33:6]. On June 3, 2014, when Det. Gregory first met with Ms. Morris, he tried to show her a photo lineup, which included Holtzclaw's photo (among five photos of officers whose names had not come up in the investigation). [Ex. 25; Ex. 8, 80:24-81:11; Ex. 21; Ex. 22; Ex. 23, 94:3-96:20]. Ms. Morris would not look at it, as she was too scared and just wanted to move on. Det. Gregory gave her a refusal to prosecute form, which she signed that day. [Ex. 24; Ex. 25]. From June 3, 2014, to June 18, 2014—the date Plaintiff Ligons came forward—no investigative steps were taken. [Ex. 8, 218:6-15]. Sex Crimes took no further action because they felt no officer had been sufficiently "developed . . . as a suspect,"[6] [*id.*, 217:16-218:22; Ex. 19, 121:12-122:1; Ex. 23, 85:18-22]; when there is no suspect, Sex Crimes typically stops investigating sexual offenses when victims decline to cooperate, because the district attorney will not file charges in those cases. [Ex. 8, 235:8-23; Ex. 18, 148:6-149:13].

   OCPD policies and procedures distinguish between criminal and administrative investigations. Whereas criminal investigations aim to secure a criminal conviction, administrative investigations are performed at the direction of the Chief of Police and aim to remove unfit personnel to protect the public. [Dkt. 159-7 (§ 143.0); Ex. 26 (§ 285.0 *et seq.*)]. Notably, OCPD did not open an administrative investigation when Sex Crimes ceased its investigation [Ex. 27], even though high-ranking officers believed they had an OCPD-officer-

---

[6] The fact that Holtzclaw's photo was included in the lineup Det. Gregory attempted to present to Ms. Morris on June 3, 2014 among photos of officers whose names had not come up in the investigation proves Holtzclaw was in fact a suspect and should have been treated as such from that point forward. Nevertheless, Sex Crimes officers have claimed he was not a suspect until after Plaintiff Ligons came forward. Assuming for purposes of argument that the City could convince a jury that Holtzclaw was not a suspect prior to June 18, 2014, the same jury could reasonably find that he *would have been* a suspect if Sex Crimes had known about his prior complaint of racial prejudice and perversion toward a Black woman.

involved case on their hands. [Ex. 28]. Capt. Bacy, then in charge of Sex Crimes and now in charge of OPS, testified that no administrative investigation was opened because Holtzclaw "hadn't been identified as a suspect in anything," and they "didn't know that he was anyone [they] needed to investigate administratively. . . ." [Ex. 19, 121:12-122:1].

Maj. Wenzel, the Investigations major at the time of the initial investigation into Ms. Morris' assault, testified that in handling investigations of OCPD personnel, like the Holtzclaw investigation, meetings and updates "would be between the detectives, the lieutenant, the captain, [herself], the deputy chief, *and the chief*." [Ex. 23, 28:5-25 (emphasis added)]. And, Maj. Wenzel suggested that the chief's office became aware of the investigation of Ms. Morris' assault on May 27, 2014. [*Id.*, 158:13-23]. It is reasonable to assume from these facts, as well as testimony that an allegation of an officer-involved serious crime is "high-profile" [Ex. 19, 39:16-22; *see also* Ex. 18, 89:24-90:1] and "a high-priority incident that would require that [sic] involvement of the chain of command," [Ex. 19, 106:16-107:11] a reasonable jury could infer that Chief Citty knew of the investigation into Ms. Morris' assault before Ms. Ligons came forward on June 18, 2014.

Consequently, had Bennett properly documented Campbell's allegations and treated them as a citizen complaint, (such that Chief Citty inevitably would have learned of allegations of Holtzclaw's propensity for aggression, prejudice and perversion against Black women), Chief Citty would have known by the end of May 2014 (1) that a Black woman, Ms. Morris, had reported she was sexually assaulted by an OCPD officer, who checked her for warrants; (2) that only one OCPD officer both met the description Ms. Morris provided and checked her for warrants in the month the she said her assault took place; and (3) that the officer was

Holtzclaw—an officer against whom a prior complaint of prejudice and perversion had been lodged by a Black woman. Thus, whether or not it is true that Holtzclaw had not been developed as a suspect in Ms. Morris' assault before Ms. Ligons came forward, he certainly would have been if Chief Citty had known of the Campbell Incident such that he could have relayed that information to Sex Crimes.[7]

Importantly, Det. Gregory would have found a complaint like Campbell's to be relevant in his investigation. Det. Gregory specifically asked Holtzclaw's supervisor, Capt. Gregory, if any women had lodged complaints against Holtzclaw. Capt. Gregory, who had nothing to do with the investigation into Campbell's complaint and had no knowledge of the facts surrounding it, told him none had. [Ex. 8, 285:21-286:14]. Det. Gregory testified that if he had known that a Black woman had lodged a complaint against Holtzclaw, he would have wanted to talk to her:

**Q**     [. . . ] [I]f you had known about that sort of complaint of driving a female . . . alone without providing . . . notification to dispatch, would that have concerned you?

**A**     Yes, I would have wanted to talk to her . . . For the simple reason of just it's a female, we have all these victims, obviously, and I'd want to – I'd want to hear her version of the story, I mean, did she think something else is going to go on, you know, was she afraid, did he tell her what he was doing. See, not every time, not everything Holtzclaw was doing was a sexual act, it wasn't – every traffic stop wasn't a rape, anything like that. It was the opportunity.

Now, in listening to a female talk about that, I would perk up to that because that's something I would want to know, is it one of those situations or maybe it was a misunderstanding, I – I don't know. I wouldn't know until I talked with her, but I would want to talk with her. [*Id.*, 287:24-289:4].

Further, and perhaps even more telling of the difference it would have made for Bennett to treat Campbell's allegations as a citizen complaint and report all of them up the chain of

---

[7] Administrative investigation files are confidential, but the Chief of Police has the power to disseminate information therein. [*See* Dkt. 159-7, p. 2].

command is the fact that, very early on in the course of the investigation into Ms. Morris' assault, OCPD detectives focused on another officer who had come into contact with Ms. Morris the month prior to her assault and who had been accused of sexual misconduct in the past. That officer, unlike Holtzclaw, did not at all fit the physical description Ms. Morris gave of her assailant; nonetheless, the prior allegation of sexual misconduct was sufficient to cause OCPD to concentrate attention on him. [*Id.*, 217:12-218:2, 44:14-25, 195:21-196:7]. [*See* Ex. 29]. Plus, once Ms. Ligons came forward on June 18, 2014, the fact that Holtzclaw's name had come up in the investigation of Ms. Morris' assault played a role in identifying him as the suspect in Ms. Ligons' assault. [*See* Ex. 29].

In sum, it is irrelevant that Bennett did not regularly supervise Holtzclaw; he was *solely* responsible for investigating Campbell's allegations and reporting them up the chain of command, and his failure to do so caused these Plaintiffs to suffer sexual battery and rape at the hands of Holtzclaw. Bennett bore all responsibility to conduct a thorough investigation of the use of force that contained very first complaint of perversion and racial prejudice against Holtzclaw and to document those allegations, and he failed to carry out that responsibility. In the report documenting his superficial "investigation" of the complaint, he omitted Campbell's allegations that Holtzclaw was prejudiced, perverted, hateful and aggressive toward her—a Black woman—to the point that she feared him enough to urinate herself, and that she feared what he would do to the next Black person he came across. Although Bennett admitted in his deposition that he would be required to report allegations like these up his chain of command, [Ex. 1, 77:17-81:16], he did not do so. As a result, those further up Holtzclaw's chain of command—who would have had the authority to discipline him—never knew of those

13

allegations and therefore never had the chance to take action on them before Holtzclaw had the opportunity to assault Plaintiffs Hill (on December 20, 2013), Morris (on May 8, 2014) and Johnson (on May 26, 2014). [Ex. 7].[8] Similarly, because of Bennett's conduct, those involved in investigating Ms. Morris' assault in May and June of 2014 were unaware of any prior allegation of racial prejudice and perversion against a Black woman, and that prevented them from confirming Holtzclaw as a suspect in Ms. Morris' assault earlier on, and, consequently, from removing him from the streets and stripping him of the power and opportunity that enabled him to victimize Plaintiffs Lyles and Ligons, who were assaulted on June 17 and 18, 2014. [Ex. 7].

Bennett had a responsibility to adequately investigate and document Ms. Campbell's allegations, and his failure to do so—a symptom of the City's custom of similar conduct—resulted in the trauma these Plaintiffs suffered. Thus, Plaintiffs request that the Court reconsider granting summary judgment on the failure-to-supervise claim.

## III.    INVASION OF THE JURY'S PROVINCE

In its Order granting Bennett's Motion for Summary Judgment, the Court appeared to minimize Campbell's testimony about Holtzclaw's racial prejudice by noting that she had filed her own lawsuit against the City. To start, the fact that Campbell filed a lawsuit against the City does not bear on her credibility as to that testimony, as the success of her claims was not at all dependent upon Holtzclaw's racial prejudice or the City's or Bennett's awareness thereof. Her

---

[8] In finding insufficient proof of causation, the Court emphasized that the Plaintiffs were assaulted "months later." This is not supported by the record, as Plaintiffs were assaulted over a six-month period, beginning the month immediately following the Campbell Incident—eight *days* after the Screening Committee reviewed Bennett's follow-up investigation. [*See* Ex. 7; Dkt. 153-1, p. 1].

claims were not based on § 1983, and she did not plead that Holtzclaw discriminated against her as a Black woman; Campbell's claims were for excessive force, negligence, negligent supervision, and intentional infliction of emotional distress. [Ex. 30]. She had no motive to lie about whether Holtzclaw was prejudiced or whether she had told Bennett that fact. More importantly, it is improper for a court to consider witnesses' credibility on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, Plaintiffs seek reconsideration of the Court's Order granting summary judgment and the opportunity for a jury to decide Campbell's credibility.

## CONCLUSION

On summary judgment, a court is to view the evidence in a light most favorable to the nonmoving party and draw all inferences in the nonmoving party's favor. If the facts were as Bennett states they are—that Campbell never told him that Holtzclaw was prejudiced, perverted, hateful, and aggressive toward her—then certainly summary judgment would be proper, as there would be no evidence on which to base a claim of inadequate supervision. However, assuming Campbell *did* tell Bennett that Holtzclaw was perverted and prejudiced, as the Court must, it becomes clear that a reasonable jury could find that Bennett failed to supervise Holtzclaw in that he failed to carry out his responsibility to investigate those allegations—that he consciously decided not to even *try* to identify witnesses nor interview previously-identified potential witnesses to ascertain the veracity of the allegations and failed to report them up his chain of command.

Further, assuming that Campbell did tell Bennett that Holtzclaw scared her to the point that she urinated on herself and she feared what he would do to the next Black person, a

15

reasonable jury could infer that Bennett failed to investigate Ms. Campbell's allegations and report them up his chain of command *with knowledge* that Holtzclaw, as a police officer on patrol in Oklahoma City, posed a substantial risk of harm to the rights of Black people, and particularly Black women. Even if a jury found itself unable to conclude that Bennett had such outright knowledge, a reasonable jury could certainly conclude that Bennett chose to maintain plausible deniability by refusing to investigate the Campbell Incident appropriately.

A reasonable jury could find that Bennett's failure to adequately investigate and document Campbell's allegations or to treat them as a citizen complaint caused Holtzclaw to become emboldened and to escalate to perpetrating sexual assault against these Plaintiffs and also prevented the OCPD from apprehending Holtzclaw before he had a chance to do sexually assault these Plaintiffs. But for Bennett's failures in these respects, Chief Citty would have learned of Campbell's allegations much earlier and would have terminated Holtzclaw because Chief Citty believed that an officer's prior actions would predict how the officer would act in the future. Had that been the case, OCPD could have prevented all the trauma Plaintiffs have endured. Even if Holtzclaw had not been terminated at that point, the Chief's knowledge of a prior complaint of prejudiced and perverted conduct would have permitted the OCPD to confirm him as a suspect earlier in their investigation of the Ms. Morris' assault and terminate him before he had the opportunity to assault Ms. Lyles and Ms. Ligons. Because Bennett did not document Campbell's allegations and report them up the chain of command, no one further up the chain of command or in Sex Crimes saw any red flags in Holtzclaw's past when he was identified as the last officer to have had documented contact with Ms. Morris and to have run her for warrants. Therefore, the investigators believed they lacked sufficient evidence of Holtzclaw's potential

involvement to justify a continued investigation after Ms. Morris signed the refusal to prosecute. As a result, the investigation ceased, and Holtzclaw assaulted three more women, including Plaintiffs Ligons and Lyles, before he was finally apprehended. In short, Bennett, by failing to carry out his obligation to document, investigate, and report up the chain of command Ms. Campbell's allegations of prejudice and perversion, set in motion a series of events that resulted in the sexual assaults on these Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that the Court reconsider its Order granting summary judgment in favor of Bennett on their failure-to-supervise claims.

Respectfully submitted,

**RIGGS, ABNEY, NEAL, TURPEN,
    ORBISON & LEWIS, P.C.**

s/Damario Solomon-Simmons
Damario Solomon-Simmons, OBA # 20340
Kymberli J. M. Heckenkemper, OBA # 33524
502 West 6th Street
Tulsa, Oklahoma 74119
(918) 587-3161—Office
(918) 587-9708—Fax
dsimmons@riggsabney.com
kheckenkemper@riggsabney.com

Melvin C. Hall, OBA # 3728
528 NW 12th Street
Oklahoma City, OK 73103
(405) 843-9909—Office
(405) 842-2913—Fax
mhall@riggsabney.com

**-and-**

17

**PARKS & CRUMP, LLC**

Benjamin L. Crump, FL Bar # 72583
122 South Calhoun Street
Tallahassee, FL 32301
bcrump@parkscrump.com

***Attorneys for Plaintiffs Ligons, Hill,***
***Johnson, Morris & Lyles***

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2019, I filed the above document with the Clerk of Court.

Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of

Electronic Filing to those registered participants of the Electronic Case Filing System.

s/Damario Solomon-Simmons

18