Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

JANNIE LIGONS, SHANDAYREON HILL, )
TABATHA BARNES, TERRI MORRIS,    )
SYRITA BOWEN, CARLA JOHNSON,     )
KALA LYLES,                      )
                                 )
         Plaintiffs,             )
                                 )
-vs-                             ) CASE NO. CIV-16-184-HE
                                 )
CITY OF OKLAHOMA CITY, a         )
municipal corporation,           )
DANIEL HOLTZCLAW, BILL CITTY,    )
BRIAN BENNETT, ROCKY GREGORY,    )
JOHN AND JANE DOES, all in       )
their individual capacity,       )
                                 )
         Defendants.             )

VIDEOTAPED DEPOSITION OF

RON CHRISTOPHER BACY

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON MARCH 27, 2019

REPORTED BY:   TRENA K. BLOYE, CSR

Ron Bacy                                                  March 27, 2019

Page 7

1                    RON CHRISTOPHER BACY,
2   after having been first duly sworn at 9:33 a.m., deposes
3   and says in reply to the questions propounded as
4   follows, to wit:
5                      DIRECT EXAMINATION
6   BY MR. SOLOMON-SIMMONS:
7       Q    Good morning, Captain.
8       A    Good morning.
9       Q    We met earlier. I'm attorney Damario
10  Soloman-Simmons and, along with my co-counsel, we
11  represent the plaintiffs in this case against the
12  Oklahoma City Police Department and others. And I
13  understand from Lt. Muzny that you are -- oh, sorry. Do
14  I need to start over?
15               VIDEO OPERATOR:  No.
16      Q    (By Mr. Soloman-Simmons) I understand from
17  Lt. Muzny that you are a big OU fan; is that correct?
18      A    Graduate.
19      Q    Just a graduate, not a huge fan?
20      A    I'm a fan.
21      Q    Oh, okay. All right, good. I'm a former
22  player so I like to hear that.
23           Why did you become a police officer?
24      A    It was a calling. It wasn't my original game
25  plan. I had contact with law enforcement in college and

```
 1     Q    Yeah, you.
 2     A    No.
 3     Q    Did you have your investigators contact Daniel
 4   Holtzclaw to find out if he, in fact, had contact with
 5   Ms. Morris on May 8, 2014?
 6     A    I don't recall.
 7     Q    Why not?
 8     A    Why don't I remember?
 9     Q    No.  Why didn't you have your investigators
10   contact Mr. Holtzclaw to find out if he, in fact, had
11   contact with Ms. Morris on May 8, 2014?
12     A    It's a criminal investigation and it's baby
13   steps.  And we're going to -- that's just a small piece
14   of the puzzle, seeing that he ran her name.  We're going
15   to try to match that, maybe, with some other things.  We
16   want to speak to the victim first if possible in
17   scenarios.  It's baby steps and parts of the
18   investigation.  You work your way to that.
19          You don't -- in this situation whereas if
20   somehow he ends up being a suspect and we've spoken to
21   him, and we've -- we don't even know what we're
22   questioning him about.  We don't have the specifics.
23   So, no, we wouldn't have spoken to him --
24     Q    Can we look --
25     A    -- right away.
```

1    A    Terri Morris stated the incident, the sexual
2  assault occurred downtown within, I believe, a two-block
3  radius of the City Rescue Mission.  She said she was
4  walking from a rehab facility to the City Rescue
5  Mission.  She was dropped off in an unknown alley
6  downtown on either May 20th or 21st.  That's eight to
7  nine days after Officer Holtzclaw ran her name through
8  our system.
9           When we checked for automatic vehicle location
10 activity in that area, nothing matched up on the 20th
11 and the 21st during those times, which would have
12 indicated that any of our officers had contact with her
13 on the date she stipulated this occurred.
14              MR. SOLOMON-SIMMONS:  Okay.  Can you
15 re-read my question to the Captain, please?
16              THE REPORTER:  Question, What stopped you
17 from having one of your investigators speak to
18 Ms. Morris?
19   A    First and foremost --
20   Q    (By Mr. Solomon-Simmons) No.  Go ahead.
21   A    First, the investigator -- it's the
22 investigator's case.  I am two levels up.  I have
23 oversight of the investigations, but I don't coordinate
24 or I don't run their investigations for them.  We can
25 direct things be done when we see they need to be done

```
 1   of that case, did it age me. The answer is yes. Was it
 2   difficult? I don't answer anything about the
 3   investigation itself to anyone that wasn't involved in
 4   that case.
 5       Q   To your knowledge has any aspect of the
 6   investigation into Mr. Holtzclaw been utilized as a
 7   training tool for other investigators or officers within
 8   the Oklahoma City Police Department?
 9       A   Not that I'm aware of.
10               (Plaintiffs' Exhibit 4 was marked for
11                identification and made a part of the
12                record.)
13       Q   Capt. Bacy, do you recognize this document I
14   have placed in front of you, which is Plaintiff's
15   Exhibit 4?
16       A   Yes.
17       Q   Will you please identify this document for the
18   record?
19       A   It appears to be an email from me to
20   Lt. Timothy Muzny with the subject being Terri Morris's
21   case, and it's dated Tuesday, June 10th, 2014, at 11:58
22   a.m.
23       Q   Okay. Do you recall writing this email to
24   Lt. Muzny?
25       A   I don't.
```

1    Q    Do you believe this is an email that you sent
2    to Lt. Muzny?
3    A    Absolutely.
4    Q    So here it says, "Where is Rocky with the
5    packet?" Do you see that first sentence?
6    A    Yes.
7    Q    What are you talking about there?
8    A    Where is he with his investigative case? Where
9    is he with this case file? At what point is he in in --
10   what step is he in? What's his progress?
11   Q    And then when you -- now, is this -- is it
12   normal for you to send these type of emails to Lt. Muzny
13   to say where is Rocky and where is he with his
14   investigation in a particular case?
15   A    Is it normal for me to ask where investigators
16   are at any step in their investigation in their case?
17   Q    Yes.
18   A    Yes. It's not uncommon if, especially with a
19   case that's high profile, to kind of know where they are
20   in their investigation, inquire if there's any new
21   information. That's not uncommon. You don't do it on
22   every case, but in certain cases that we know the chain
23   of command is aware of and should be aware of, we want
24   to keep them updated.
25   Q    So you would agree with me that this is not a

```
 1   common step for you to take in the normal case?
 2       A    Yes and no.  There are cases that I want to
 3   know because I want to know.  We're investigating an
 4   elderly woman whose door was kicked in and she was
 5   sexually assaulted and she's in her 80s.  I want to know
 6   where we are on that case.  And I'll ask, Hey, where are
 7   we on that?  That's not uncommon.
 8            There are times when a case is a little more
 9   high profile and it -- it's more of a -- and it's a
10   little more high profile and I know the chain of command
11   is aware, I want to give timely updates to my chain of
12   command.  So I will ask, "Hey, where are we at with this
13   case?"  It's not overly uncommon.
14       Q    Okay.  So in your next sentence you say,
15   "Please ensure it is not presented before Maj. Wenzel
16   and Chief Kuhlman have reviewed it."  Do you see that?
17       A    Yes.
18       Q    Why did you send that email?  I mean, why did
19   you write that?
20       A    It was just a reminder.  Anything that's
21   officer involved that's gonna be presented to the
22   District Attorney's Office, my chain of command always
23   wanted to review that case file first.
24       Q    Why?
25       A    To ensure that they were satisfied with the
```

Page 133

1   work that had been done and it's going to be presented
2   to the District Attorney's Office.
3       Q   When you say satisfied, what do you mean by
4   being satisfied --
5       A   They --
6       Q   -- with the work that was done?
7       A   I'm sorry. I didn't mean to cut you off.
8           They will review the case file. Well, first
9   and foremost, it comes to me and I'll review it. I will
10  try to determine if I -- if I feel like we've done what
11  we need to do and we have enough probable cause. And it
12  doesn't matter if we have probable cause or not. We're
13  still going to present it to a district attorney,
14  because even if we don't we still need them to decline
15  the case.
16          But with that being said, then it goes to -- it
17  would go to my Maj. Denise Wenzel and she would look at
18  it and ensure that she felt like we had done a
19  satisfactory enough job and we'd done everything that
20  needed to be done in order to present it the District
21  Attorney's Office.
22          And the same with Deputy Chief Kuhlman, just
23  make sure we had done what we needed to do and had
24  enough information at that point to present to the
25  District Attorney's Office.

```
 1      Q    Well, do you know why that particular process
 2   that you just described is necessary only -- or
 3   necessary on all officer-involved cases?
 4      A    I don't -- I didn't create that protocol and it
 5   would only be speculation on my part.  But these are
 6   high-profile cases that involve the organizational
 7   integrity, and we want to ensure that we've done what we
 8   need to do in these investigations prior to presenting
 9   it to an outside agency.  In this case it be would the
10   District Attorney's Office.  So it's basically checks
11   and balances.  It's a priority because it involves us.
12      Q    So when you asked Rocky where is he with the
13   packet, you were talking about a packet of information
14   that's going to be presented to the DA's office;
15   correct?
16      A    Packet is just terminology.  Where are you at
17   on your case?  At what stage, how far are you, how close
18   before -- how soon before you are done, what else do you
19   need to do.  It's just at what stage is he in in his
20   investigation or his case file or whatever the case may
21   be.  He may be done with the investigation, but he's
22   still putting his case file together, he's still may be
23   typing reports, filling out blue sheets, probable cause
24   affidavits.  He may still have work to do.  He can be
25   done with the investigation and still have work to do.
```

Ron Bacy                                                    March 27, 2019

Page 135

1    Q    And when this work to do before he presents it
2    to the DA's office; correct?
3    A    Yes.
4    Q    So, if I understand you correctly, every case,
5    once an investigation is opened up, every case is gonna
6    be presented to the DA's office?
7    A    Not every case.
8    Q    But this case and Terri Morris's case was going
9    to be presented to the DA's office; is that correct?
10   A    Yes.
11   Q    Did you get a response to this email?
12   A    Can I clarify that answer?
13   Q    Can you answer this, my next question and then
14   come back to it?  Did you get a response to this email?
15   A    I don't remember.  I'm sure -- I'm sure I got a
16   response.  I don't know in what format.  I don't know if
17   it was a phone call, a in-person visit or --
18   Q    What is your -- what do you remember the
19   response you received from Lt. Muzny regarding this
20   email you sent to him?
21   A    I don't remember what the response was to this
22   particular email.
23   Q    Did you ever get your answer -- did you ever
24   get an answer to your question of where Rocky was with
25   his -- with his investigation?

```
 1     A    The answer would be yes, because I never asked
 2   for an update on a case and not got one from my
 3   employees or subordinates.
 4     Q    So what was your understanding -- was it your
 5   understanding that Terri Morris's case was still
 6   actively being investigated up to the time that Jannie
 7   Ligons made her report on June 8, 2014?
 8     A    Takes me back to the original question we were
 9   gonna ask, when you asked was it going to be presented
10   anyway.  You don't present cases with no suspects to the
11   District Attorney's Office.  Who do you fill a probable
12   cause affidavit out on, per se?
13          With that being said, there was work still
14   being done on that case.  As far as where the
15   investigation was at that stage, I don't know.  She had
16   filled out a decline to prosecute form, but he wasn't
17   done with his investigative -- well, with his casework.
18   That's not the end of it.  You'll -- as she can tell
19   you, you'll sit down and you'll do an interview, but you
20   have to go back and review that, you have to type it up,
21   you have to organize your case file.  So there's still
22   work to be done.  And that case had not been presented
23   up the chain of command.  It wasn't done.
24     Q    Was there -- so it's your understanding -- when
25   did you learn that Ms. Morris had filled out a -- I
```

Ron Bacy                                                March 27, 2019

```
                                                          Page 137
 1   forget the terminology -- decision not to prosecute?
 2       A    I don't remember specifically when I was told,
 3   but I'm sure it was pretty soon afterwards.
 4       Q    So it was your understanding that Det. Gregory
 5   continued to investigate Ms. Morris's allegations after
 6   she filled out the forms saying I didn't want -- I don't
 7   want to prosecute?
 8            MR. SMITH:  Object to the form.
 9       A    It's my understanding he wasn't done with the
10   case.
11       Q    (By Mr. Solomon-Simmons)  I understand that.  My
12   question is, is it your understanding that Det. Gregory
13   continued to investigate Ms. Morris's allegations after
14   she signed the form stating I don't want to prosecute?
15       A    I don't remember if he continued to
16   investigate.  I just know he wasn't -- that case hadn't
17   reached final disposition yet.
18       Q    Did you have any conversations yourself with
19   Det. Gregory about the Terri Morris case?
20       A    I don't remember.  I had most of my
21   conversations with Lt. Muzny.  It's possible.  Was there
22   a time when we discussed it?  It's possible, yes.  I
23   don't recall those conversations.
24               (Plaintiff's Exhibit 5 was marked for
25                identification and made a part of the
```